<u>**NOT FOR PUBLICATION**</u>

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re:                                                   :        Chapter 11
                                                         :
      NORTHEASTERN CONFERENCE            :        Case No. 02-30073 (CGM)
      NURSING HOME, INC.,               :
                                                         :
                 Debtor.         :
----------------------------------------------------------------x
                                                         :
J. HENRY NEALE, JR., Trustee of the Victory              :        Adv. Proc. No. 05-9036
Lake Nursing Home Employees' Retirement                  :
Plan,                                                    :
                                                         :
            Plaintiff              :
                                                         :
      - against -                           :
                                                         :
HEALTHCARE MANAGEMENT SERVICES                           :
GROUP, LLC,                                              :
                                                         :
           Defendant.             :
----------------------------------------------------------------x

## MEMORANDUM DECISION DENYING MOTIONS
## FOR SUMMARY JUDGMENT AND LIMITING ISSUES AT TRIAL

<u>**A P P E A R A N C E S :**</u>

Benjamin Zelermyer, Esq.
STEINBERG & CAVALIERE, LLP
50 Main Street, Suite 901
White Plains, New York 10606
*Attorneys for Plaintiff*

Deryck A. Palmer, Esq.
Peter D. Isakoff, Esq.
Jennifer Feldsher, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
*Attorneys for Defendant*

**CECELIA G. MORRIS**
**UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding was commenced by the Trustee of the Victory Lake

Nursing Home Employees Retirement Plan (the "Pension Plan Trustee"), representing

approximately 179 former employees of the Chapter 11 Debtor.  (The Victory Lake

Nursing Home Employees' Retirement Plan, described more fully below, is referred to in

this decision as the "Pension Plan".)  The Pension Plan Trustee seeks a declaration that

Defendant Healthcare Management Services Group, LLC ("HMSG"), which ultimately

purchased the Victory Lake Nursing Home ("Victory Lake"), is liable to the Pension Plan

for approximately $475,000, the minimum funding requirements that the Pension Plan

Trustee claims were due between March 10, 2003, when HMSG became the manager of

Victory Lake, and June 24, 2004, after which HMSG became the owner.

HMSG has now moved, and the Pension Plan Trustee has cross-moved for

summary judgment.  After considering the papers submitted by both parties and the oral

argument January 24, 2006, both motions for summary judgment are denied for the

reasons set forth below.  The Pension Plan Trustee has asserted a colorable claim that

survives summary judgment, and a trial will be necessary to determine the factual issues

identified in Part III of the Discussion section of this memorandum decision.

## <u>Jurisdiction</u>

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28

U.S.C. § 157(a) and the Standing Order of Reference signed by Acting Chief Judge

Robert J. Ward dated July 10, 1984.  This is a "core proceeding" under 28 U.S.C. §

157(b)(2)(A) ("matters concerning administration of the estate) and (b)(2)(O) ("other

proceedings affecting the liquidation of the assets of the estate or the adjustment of the

debtor-creditor or the equity security holder relationship"). The Court retained

jurisdiction of this matter pursuant to Section 11.1(g), (h) and (l) of the confirmed

Chapter 11 Plan, and the parties to this adversary proceeding have consented to this

Court's jurisdiction.

## **Background Facts**[1]

On April 17, 2002, Northeastern Conference Nursing Home, Inc. d/b/a Victory

Lake Nursing Center (the "Debtor") commenced a case under chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code"). A statutory committee of unsecured

creditors (the "Creditors Committee") was appointed in the chapter 11 case on June 4,

2002. Initially, the Debtor was authorized to operate its business and manage its

properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code. After the Debtor was unable to operate Victory Lake on a cash-

positive basis, the Court, by order dated January 6, 2003, appointed Mark I. Fishman

chapter 11 trustee to operate Victory Lake (the "Trustee" or "Chapter 11 Trustee").

The Chapter 11 Trustee, with the support of the Creditors Committee, determined

to sell Victory Lake to the highest or best bidder pursuant to section 363 of the

Bankruptcy Code and/or a chapter 11 plan. *See* Trustee's March 14, 2003 "Motion

Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and Rules 2002 and 6004 of

the Federal Rules of Bankruptcy Procedure for an Order Approving (i) Bid Letter with

Health Care Management Services Group, LLC, (ii) Procedures for the Consideration of

Competing Bids, (iii) the Form and Manner of Notice of Procedures for Consideration of

Alternative Bids and (iv) Termination Fee and Expense Reimbursement Payments." The

---

[1]    Unless otherwise noted, this statement of facts is taken from HMSG's "Statement of Undisputed
Material Facts in Support of Motion for Summary Judgment" pursuant to Local Bankruptcy Rule 7056-1.

Chapter 11 Trustee and the Creditors Committee also determined that it would not be possible to operate the nursing home on a break-even basis for the time it would take to complete the sale process. *Id*. Accordingly, as part of their negotiations with prospective purchasers, the Chapter 11 Trustee and the Creditors Committee considered desirable a purchaser that could also operate the nursing home pending the closing of a sale. *Id.*

**The Management Agreement**

In February 2003, Healthcare Management Services Group, LLC ("HMSG" or the "Defendant"), whose members were skilled nursing home operators, expressed an interest in purchasing the operating assets of Victory Lake. While the Chapter 11 Trustee was receptive to a potential sale of Victory Lake, he would accept a bid from HMSG only if HMSG also agreed to operate the nursing home, at no cost to the estate, pending completion of the sale process. As a result, the parties simultaneously entered into a binding bid letter outlining the terms for HMSG's purchase of Victory Lake ("Bid Letter"), and a management agreement (the "Management Agreement") which granted HMSG operational control of the nursing home in advance of completion of the sale process.

HMSG and the Chapter 11 Trustee, on behalf of the Debtor, entered into the Management Agreement dated March 10, 2003. The Bankruptcy Court approved the Management Agreement on March 10, 2003, on an interim basis, pending notice and a hearing. The Bankruptcy Court entered a final order approving the Management Agreement on March 26, 2003. According to the terms of the Management Agreement, HMSG agreed to manage Victory Lake, correct the deficiencies in its operations, and

absorb all of the losses at the nursing home until the termination of the Management

Agreement or the sale of the nursing home to HMSG.  The Chapter 11 Trustee

agreed that HMSG would only be responsible for obligations that Victory Lake incurred

on or after March 10, 2003. Section 1.4 of the Management Agreement states that

HMSG:

> shall be responsible for all expenses incurred by the Facility or that
> become due on and after March 10, 2003, on an accrual basis in
> accordance with Generally Accepted Accounting Principles, during its
> period of operation of the Facility under this Agreement.

(emphasis added).

### The Asset Purchase Agreement ("APA")

HMSG and the Chapter 11 Trustee, on behalf of the Debtor, entered into

an asset purchase agreement ("APA") dated October 10, 2003.  Pursuant to the APA,

HMSG agreed to purchase substantially all of the operating assets of Victory Lake,

including:

> [A]ll of the business, assets, properties, contractual rights, goodwill, going
> concern value, rights and claims of the Debtor... exclusively related to the
> Business, wherever situated and of whatever kind and nature, real or
> personal, tangible or intangible, whether or not reflected on the books and
> records of the Debtor (other than Excluded Assets)…

APA § 2.1.  The Pension Plan was an Excluded Asset that was not sold, transferred,

assigned or conveyed to HMSG pursuant to the APA.  Section 8.3(j) of the APA

provided that "the Purchaser will not constitute a successor employer for purposes of any

Employee Benefit Plan or other employment related matter except collective bargaining

agreements."

On October 14, 2003, this Court approved the sale of Victory Lake to HMSG

pursuant to the APA, free and clear of claims and encumbrances thereon.  HMSG argues

that it never assumed or adopted any responsibility or other obligation with respect to the

Pension Plan in accordance with the procedures enumerated in the Pension Plan or

otherwise.  HMSG and the Pension Plan Trustee agree that HMSG did not adopt the

Pension Plan in the APA.

## The Pension Plan

The Pension Plan was a single employer defined benefit pension plan, originally

effective as of January 1, 1976 according to the Pension Plan's Preamble[2] and according

to the November 13, 2003 "Statement of the Pension Benefit Guaranty Corporation[3]

Addressing the Chapter 11 Trustee's Motion for Authority to Terminate Pension Plan and

for Related Relief" (the "PBGC Statement"), ¶¶ 5-6.  The PBGC Statement confirms that

the Pension Plan was established and maintained by Victory Lake.  The PBGC Statement

also refers to a June 15, 1994 Internal Revenue Service Private Letter Ruling (the

"Private Letter Ruling") applied for by Victory Lake.  The Private Letter Ruling

determined that the Pension Plan "qualifies as a church plan within the meaning of

---

[2]     The Preamble to the Pension Plan states in relevant part:

The purpose of this Plan and Trust is to provide, in accordance with its provisions, a
defined benefit pension plan providing retirement and other related benefits for those
Employees of the Employer who are eligible to participate hereunder.

***

The Plan has been created with the intent that it qualifies for approval under Section 401
and 410 through 417 of the Internal Revenue Code.  The Trust has been created with the
intent that it qualifies for approval under Section 501of the Code.  It is further intended
that the Plan comply with the provisions of the Employee Retirement Income Security
Act of 1974 (ERISA).  In case of any ambiguity in the Plan's language, it will be
interpreted to accomplish the Plan's intent of qualifying under the Code and complying
with ERISA.

[3]     Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA") sets out the
provisions relating to the federal pension plan termination insurance program, and charges the Pension
Benefit Guaranty Corporation, a wholly-owned United States government corporation, with administering
the program. *See* ERISA §§ 4001-4402, 29 U.S.C. §§ 1301-1461 (Title IV of ERISA).

section 414(e) of the [Internal Revenue] Code and has had such status since January 1,

1976." Private Letter Ruling, p. 5. "The term 'church plan' means a plan established and

maintained . . . for its employees (or their beneficiaries) by a church or by a convention or

association of churches which is exempt from tax under section 501 of Title 26." 29

U.S.C. §§ 1002(33)(A), 1321(b)(3); 26 U.S.C. § 414(e). At the time this case was filed,

Victory Lake was owned by the Corporation of Seventh-Day Adventists (the

"Northeastern Conference"), a church which owns and operates Seventh-Day Adventist

Church congregations. The Pension Plan's status as a church plan is significant because

such plans are not subject to the minimum funding requirements of section 412 of the

Internal Revenue Code of 1986, as amended ("Internal Revenue Code") or the benefit

protections and guarantees of Title IV of the Employee Retirement Income Security Act

of 1974, as amended ("ERISA"). In the absence of an exemption from the applicable

sections of the Internal Revenue Code and from ERISA, Victory Lake, as the

"Employer," as that term is defined in the Pension Plan, was presumably[4] required to

make contributions to the Retirement Plan in amounts not less than the minimum

required under Section 412 of the Internal Revenue Code.

According to the Retirement Plan Trustee, as of March 2003, when HMSG

became the operator of the Nursing Home, the Pension Plan was underfunded (its vested

liabilities exceeded its assets) by approximately $1,650,000. Complaint, ¶ 42. That is,

prior to any involvement by HMSG, the Pension Plan was already significantly

underfunded.

---

[4]      The Court makes no findings or legal conclusions concerning this statement.

**The Chapter 11 Trustee's Plan of Liquidation**

The plan of liquidation filed by the Chapter 11 Trustee on February 19, 2004 (the

"Plan" or "Chapter 11 Plan") provided for cash disbursements to creditors in accordance

with the priority scheme established by the Bankruptcy Code. The claims of the Pension

Plan were separately classified in Class 5 of the Plan and were entitled to the following

treatment:

> The Class 5 Claim or Claims shall be paid in cash from the Purchase Price
> (of the sale of Victory Lake to HMSG) . . . the amount of such Claim or
> Claims as estimated by the Bankruptcy Court or such other amount as may
> be agreed between Claimant and the [Chapter 11] Trustee, not to exceed
> $100,000.00 in full satisfaction (together with the payment of a dividend
> upon Claimant's Unsecured Claim, if any, if dividends are paid to
> Unsecured Creditors) of any and all Claims of the Debtor's pension plan,
> of current and former employees of the Debtor with respect to pension
> matters and of the Pension Benefit Guaranty Corporation.

Plan § 3.5. All creditors and equity security holders were provided notice of the Plan and

an opportunity to object, although, as noted below, during much of the time the Plan was

being negotiated, the Pension Plan did not have a trustee or other appointed

representative.  Neither the Pension Plan, nor any of the participants in the Pension Plan,

objected to the Plan.

HMSG also argues that the Plan released HMSG from all claims related to

Victory Lake other than those it expressly assumed, and enjoined the actions of third

parties, including the Pension Plan Trustee, against HMSG, citing to Section 9.5 of the

Plan, which states in relevant part:

> Any claims of Debtor's pension plan against the Purchaser[5] and the
> property transferred to the Purchaser pursuant to the APA, the
> Management Agreement or the Plan are all expressly waived, released and
> enjoined to the full extent provided in Sections 9.1, 9.2, 9.3 and 9.4 of this
> Article IX.

---

[5]    References in the Plan to the "Purchaser" are to HMSG.

Sections 9.1, 9.2, 9.3 and 9.4 of the Plan provide:

9.1 <u>Waiver of Claims</u>: As of the Confirmation Date, but subject to the occurrence of the Effective Date, and except as otherwise expressly provided in the Confirmation Order or under the Plan, **all Persons who have held, hold or may hold Claims against** or Ownership Interests in the Debtor **shall be deemed to have forever covenanted with** the Trustee, the Creditors' Committee and its members, in their capacity as such, **the Purchaser**, the Northeastern Conference and, in their capacity as such, with each of such persons' or entities' respective successors, assigns, attorneys, accountants, court-approved financial advisors, principals, affiliates, parents, subsidiaries, officers, directors, partners, employees, sureties and stockholders, **not to (a) sue, or otherwise seek any recovery from any of the foregoing**, whether for tort, fraud, contract or otherwise, **based upon any act or omission performed or occurring before the Confirmation Date arising out of the business or affairs of the Debtor**; or (b) assert any Claim which any such holder of a Claim or Ownership Interest in the Debtor may be entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, based in whole or in part upon any act or omission performed or occurring on or before the Confirmation Date in any way relating to the Debtor, the Chapter 11 Case or the Plan **except with respect to obligations or liabilities under this Plan, the Asset Purchase Agreement or the Management Agreement and except with respect to willful misconduct or gross negligence**.

9.2 <u>Release/Termination of Bond</u>: As of the Confirmation Date, but subject to the occurrence of the Effective Date, and except as otherwise expressly provided in the Confirmation Order or under the Plan, **all Persons who have held, hold or may hold Claims against** or Ownership Interests in **the Debtor shall be deemed to have released** the Trustee, the Creditors' Committee and its members, in their capacity as such, **the Purchaser**, the Northeastern Conference and, in their capacity as such, each of such persons' or entities' respective successors, assigns, attorneys, accountants, court-approved financial advisors, principals, affiliates, parents, subsidiaries, officers, directors, partners, employees, sureties and stockholders, **from all claims, causes of action, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, based in whole or in part upon any act or omission performed or occurring on or before the Confirmation Date in any way relating to the business or affairs of the Debtor, the Chapter 11 Case or the Plan except with respect to obligations or liabilities under this Plan, the Asset Purchase Agreement or the Management Agreement and except with respect to willful misconduct or gross negligence**. Upon the closing of the estate or of the Chapter 11 Case or, if earlier, upon the

distribution of substantially all funds of the estate, the Trustee's bond and Disbursing Agent's bond shall be released, terminated and exonerated.

9.3 Injunction: As of the Confirmation Date, but subject to the occurrence of the Effective Date, and except as otherwise expressly provided in the Confirmation Order or under the Plan, and except with respect to obligations or liabilities under this Plan, the Asset Purchase Agreement or the Management Agreement, **all Persons who have held, hold or may hold Claims against** or Ownership Interests in **the Debtor are, with respect to any such Claims or Ownership Interests, permanently enjoined from and after the Confirmation Date, from (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial , arbitral, administrative or other forum) against or affecting** the Trustee, the Creditors' Committee and its members, in their capacity as such, **the Purchaser**, the Northeastern Conference or, in their capacity as such, any of such persons' or entities' respective successors, assigns, attorneys, accountants, court-approved financial advisors, principals, affiliates, parents, subsidiaries, officers, directors, partners, employees, sureties or stockholders, or any of such persons' or entities' property, or any direct or indirect transferee of any property of, or direct or indirect successor-in-interest to, any of the foregoing Persons, or any property of such transferee or successor; (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, of any judgment, award, decree or order against the Trustee, the Creditors' Committee or its members, in their capacity as such, the Purchaser, the Northeastern Conference, or any of such persons' or entities' property, or any direct or indirect transferee of any property of, or direct or indirect successor-in-interest to, any of the foregoing Persons, or any property of such transferee or successor; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Lien against the Trustee, the Creditors' Committee and its members, in their capacity as such, the Purchaser, the Northeastern Conference, or any of such persons' or entities' property, or any direct or indirect transferee of any property of, or direct or indirect successor-in-interest to, any of the foregoing Persons, or any property of such transferee or successor; (d) asserting any right of setoff, subrogation or recoupment of any kind, directly or indirectly, against any obligation due the Trustee, the Creditors' Committee and its members, in their capacity as such, the Purchaser, the Northeastern Conference, or any of such persons' or entities' property, or any direct or indirect transferee of any property of, or direct or indirect successor-in-interest to, any of the foregoing Persons, or any property of such transferee or successor; and (e) acting or proceeding in any manner that does not comply with the provisions of the Plan.

- 10 -

9.4 <u>Exoneration</u>: **Neither** the Trustee, the Disbursing Agent, the Creditors' Committee, its members, in their capacity as such, **the Purchaser**, the Northeastern Conference **nor any of such persons' or entities' respective successors**, assigns, attorneys, accountants, court-approved financial advisors, principals, affiliates, parents, subsidiaries, officers, directors, partners, employees, sureties or stockholders **shall have or incur any liability to each other or to any holder of a Claim or Ownership Interest for any act or omission in connection with, or arising out of**, (a) the negotiation, documentation or implementation of the transactions contemplated by the Plan (including consideration of any alternatives hereto, if any); (b) the Disclosure Statement or any contract, instrument, release or other agreement or document entered into in connection with the Plan; (c) the pursuit of confirmation of the Plan; (d) the consummation of the Plan; (e) the administration of the Plan or the funds to be distributed pursuant to the Plan; or (f) the administration of the Chapter 11 Case, except in the case of that party's gross negligence or willful misconduct, **except with respect to obligations or liabilities under the Plan, the Asset Purchase Agreement or the Management Agreement, and except as otherwise set forth in the Plan.** The entry of the Confirmation Order shall constitute the determination by the Bankruptcy Court that the Trustee, the Creditors' Committee and its members, in their capacity as such, and such persons' or entities' respective successors, assigns, attorneys, accountants, court-approved financial advisors, principals, affiliates, parents, subsidiaries, officers, directors, partners, employees, sureties and stockholders have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, pursuant to, among others, Section 1125(e) and 1129(a)(3) of the Bankruptcy Code, with respect to the foregoing.

(emphasis added). In addition, Section 10.4(g) of the Plan (like the APA) provides that

"the Purchaser does not constitute a successor employer for purposes of any Employee

Benefit Plan or other employment related matter except collective bargaining

agreements."

By order dated February 20, 2004, this Court confirmed the Plan ("Confirmation

Order") and determined, among other things, that:

Releases, Exculpations, and Injunctions. The releases, exculpations and injunctions under the Plan in favor of the Trustee, HMSG, the Creditors' Committee and its members, in their capacity as such, the Northeastern

> Conference, and in their capacity as such, each of such persons' or
> entities' respective successors, assigns, attorneys, accountants, court-
> approved financial advisors, principals, affiliates, parents, subsidiaries,
> officers, directors, partners, employees, sureties and stockholders are
> essential elements of the APA and the Plan and the ability to consummate
> the Plan. The Plan is wholly predicated upon the APA and the
> consideration HMSG is providing thereunder.
>
> * * *
>
> Releases and Injunctions. The release and injunction provisions contained
> in Article IX of the Plan are fair and equitable, are given for valuable
> consideration, and are in the best interests of the Trustee and the Debtor's
> estate, and such provisions shall be effective and binding upon all persons
> and entities, including all persons who have held, hold or may hold Claims
> against or Ownership Interests in the Debtor, subject to the provisions set
> forth hereinafter in this Confirmation Order.

Confirmation Order ¶¶ T, 18.

### Termination of the Pension Plan

On or about November 6, 2003, the Chapter 11 Trustee filed a motion and related

affidavit to terminate the Pension Plan as of March 10, 2003 (the "Termination Motion").

In the Termination Motion, the Chapter 11 Trustee asserted that the Pension Plan was a

"church plan" and therefore not subject to the minimum funding requirements of section

412 of the Internal Revenue Code or the benefit protections and guarantees of Title IV of

ERISA. Termination Motion ¶ 14.  The Chapter 11 Trustee noted that as a church plan

not governed by Title IV of ERISA, the Pension Plan was not required to adhere to the

procedural termination mechanisms required by ERISA. Termination Motion ¶ 24.

On or about November 17, 2003, the PBGC filed the PBGC Statement in the

Bankruptcy Court, agreeing with the Chapter 11 Trustee's assessment that the Pension

Plan was a church plan not subject to Title IV of ERISA and noting that a church plan is

not covered by Title IV of ERISA unless it has made an irrevocable election under

section 410(d) of the Internal Revenue Code to have the participation, vesting, funding

and other rules of the Internal Revenue Code apply. PBGC Statement ¶ 2.  As a basis for

this assessment the PBGC Statement cited the finding in the Private Letter Ruling that the

Pension Plan was a church plan, and that no section 410(d) election had been made.  The

PBGC Statement also noted that in a separate settlement agreement (the "Settlement

Agreement") executed on December 21, 1995 among the PBGC, the Northeastern

Conference, Victory Lake and the Pension Plan (which provided for a refund of

$14,408.95 in Pension Plan premiums previously paid by Victory Lake), the Northeastern

Conference, Victory Lake and the Pension Plan each acknowledged their understanding

that the Pension Plan would not thereafter be covered by the pension insurance program

set forth in Title IV of ERISA and each certified "that they would not hereafter seek to

make an election under [section 410(d) of the Internal Revenue Code] to have the

provisions of Title IV of ERISA apply to the Pension Plan <u>as if it were not</u> a church

plan". Settlement Agreement at 3; PBGC Statement ¶ 3 (emphasis added). As a result, the

PBGC concluded:

> [C]hurch plans, as defined [in] § 414 of the Internal Revenue Code
> ("IRC"), are not covered by Title IV of ERISA. Accordingly, because the
> Pension Plan has been determined by the Internal Revenue Service to be a
> church plan as defined in IRC § 414, the Pension Plan is not a plan that is
> covered by Title IV of ERISA, so that the termination provisions thereof
> do not apply to the Pension Plan. . . . Accordingly, PBGC's authority does
> not reach the manner by which this non-covered Pension Plan may be
> terminated.

PBGC Statement ¶ ¶ 5-6.

On or about December 1, 2003, the Pension Plan filed a response to the

Termination Motion, objecting to, among other things, the proposed termination date of

March 10, 2003 (hereafter, "Pension Plan's Response").  It should be noted here that

prior to the response filed by the Pension Plan to the Termination Motion, the Pension

Plan Trustee had not been appointed, and the Pension Plan was not represented by a trustee or other fiduciary; thus, the interests of the Pension Plan were not directly represented at the time the Management Agreement and APA were negotiated and approved. The extent to which the Pension Plan was represented in negotiations concerning the confirmed Plan is not clear.

On January 8, 2004, the Chapter 11 Trustee and the Pension Plan entered a "Stipulation of Settlement of Motions, Claims and Objections Relating to Victory Lake Nursing Home Employees' Retirement Plan" (hereafter, the "Stipulation"), which was approved by order dated January 15, 2004. Pursuant to the Stipulation, the Chapter 11 Trustee and the Pension Plan stipulated to the allowed amount of the Pension Plan's claims against Victory Lake's estate and to the Pension Plan's termination as of the effective date of the Chapter 11 Plan, which was June 25, 2004. Specifically, the parties agreed that the Pension Plan would receive the following:

> (i) with respect to its allowed unsecured priority and/or administrative claim under sections 507(a)(1) and (4) of the Bankruptcy Code, a payment of $100,000 on the Distribution Date (as defined in the Plan), and (ii) with respect to its allowed general unsecured claim, a claim of $535,952, plus $72,447.24 for interest from January 1, 2000 to the petition date.

Stipulation ¶¶ 1-2. The Stipulation also provided that "[e]xcept as specifically set forth herein, the settlement reflected in this Stipulation is intended by the parties hereto to dispose of and resolve, as between the Pension Plan, on the one hand, and the debtor, the Trustee and the Estate, on the other hand, all matters concerning the Pension Plan . . .". *Id.* Stipulation ¶ 11.

HMSG was not a party to the Stipulation. However, HMSG argues that the Stipulation only contained a limited modification to the broad releases granted under the

- 14 -

Plan to permit claims of the Pension Plan Trustee only against the Northeastern

Conference. Namely, the Stipulation provides, in relevant part:

> Article IX of the Amended Chapter 11 Plan will be amended so as to
> exclude from the waiver, release, injunction and exoneration provisions
> set forth therein claims, suits, actions or causes of action, if any, which the
> Pension Plan may have against the Northeastern Conference or its
> successors, assigns, principals, affiliates, parents, subsidiaries, officers,
> directors and/or employees.

Stipulation ¶ 10.

**The Instant Action**

In an attempt to facilitate the resolution of issues surrounding the underfunding of

the Pension Plan, on May 24, 2005 the Court directed that the Pension Plan Trustee,

Northeastern Conference and HMSG submit to mediation.  On July 14, 2005 the

mediator filed a final report noting that although a mediation conference had been

conducted on June 17, 2005, settlement could not be reached.

On August 18, 2005, the Pension Plan Trustee filed this complaint (the

"Complaint") seeking, among other things, a declaratory judgment that (i) the Pension

Plan ceased to be a "church plan" under section 412(e) of the Internal Revenue Code on

March 10, 2003 and was, as of that date, subject to ERISA and to the minimum funding

requirements of section 412 of the Internal Revenue Code and the IRS regulations

thereunder, and (ii) HMSG was liable to the Pension Plan for the period in which it

served as interim manager of Victory Lake for minimum funding contributions totaling

not less than $475,000, plus any PBGC premiums and/or other amounts due and owing

with respect to the PBGC. Complaint, ¶ 9-10.  HMSG answered the Complaint on

September 19, 2005.  No discovery has been taken in this action.

- 15 -

## DISCUSSION

### I.    Standards for Granting Summary Judgment

Pursuant to Rule 56(c), incorporated by Bankruptcy Rule 7056(c), summary

judgment should be granted to the moving party if the Court determines that "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with

affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477

U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R. Civ. P. 56(c)).  A

movant has the initial burden of establishing the absence of any genuine issue of material

fact. *Id.*, 477 U.S. at 322-23.  When ruling upon cross-motions for summary judgment,

the court must evaluate each motion separately and must draw all reasonable inferences

against the party whose motion is under consideration. *See Coach, Inc. v. Peters*, 386 F.

Supp.2d 495, 497 (S.D.N.Y. 2005).

### II.    Standing

HMSG contends that the Management Agreement "expressly provided that no

third party rights would be created by HMSG's agreement to step in as interim manager

of the nursing home," citing to Section 9.1 of the Management Agreement.  Section 9.1

of the Management Agreement provides:

> Non-Party Status. No person, firm, corporation, or entity which is not a
> party to this Agreement shall be entitled to rely upon or demand
> enforcement of any term, covenant, condition, agreement, or
> understanding set forth and contained herein.

The Pension Plan Trustee responds that he "does not sue based on the

Management Agreement *per se*, but on the interlocking and combined bases of the

- 16 -

Management Agreement, the Retirement Plan and ERISA." *See* Pension Plan Trustee's

Memo of Law, page 12.[6]

The Pension Plan Trustee cites to Section 11.04(l) of the Pension Plan, which

authorizes and empowers the Pension Plan Trustee "To begin, maintain or defend any

litigation necessary in connection with the administration of the [Pension] Plan . . . ."

Because it is not disputed that the Pension Plan Trustee has standing to sue under the

Pension Plan, this adversary proceeding can properly proceed on that basis.  The Court

rules only that the Pension Plan Trustee has standing to bring this adversary proceeding,

though whether HMSG may be liable to the Pension Plan on any theory can not be

decided without a trial.

## III.    <u>Issues for Trial</u>

HMSG and the Pension Plan Trustee agree that HMSG did not adopt the Pension

Plan in the APA.  Thus, the only period during which HMSG may have been liable for

funding the Pension Plan was the period between the date the Management Agreement

was approved, March 10, 2003, and June 24, 2004, when HMSG became the owner of

Victory Lake and specifically excluded the Pension Plan from the list of assumed

liabilities in the APA.

HMSG insists that it never assumed the Pension Plan because assumption was not

provided for in the Management Agreement.  HMSG contends that prior to the Court's

approval of the APA, Victory Lake was owned by the Northeastern Conference.  The

Pension Plan Trustee contends that when HMSG became the operator of Victory Lake

and the employer of its employees under the Management Agreement, the employees of

---

[6]        The Pension Plan Trustee's equitable arguments under ERISA are discussed briefly in Part III,
*infra*.

- 17 -

Victory Lake were no longer employees of a "church or convention or association of
churches" and that:

> Accordingly, effective March 10, 2003, when HMSG became the operator
> of the Nursing Home and the employer of its employees, the Retirement
> Plan no longer qualified as and therefore ceased to be a "church plan"
> within the meaning of section 414(e) of the Internal Revenue Code and
> was therefore no longer exempt from ERISA; the Retirement Plan became
> subject to the minimum funding requirements of section 412 of the
> Internal Revenue Code; and the benefits provided under the Retirement
> Plan were required to be protected and insured by PBGC.

Complaint, ¶40.  This is the Pension Plan Trustee's strongest argument, and this is the
ultimate question that requires a trial.

The Court believes that three key issues at trial will be:

1. When did the Pension Plan's church plan status terminate?
2. What entity "maintained" or controlled the Pension Plan after termination of
the Pension Plan's church plan status?
3. Did HMSG assume liability, explicitly or implicitly, for expenses of the
Pension Plan?

As discussed above, 26 U.S.C. § 414(e) defines a church plan as: "a plan
established and maintained . . . for its employees (or their beneficiaries) by a church or by
a convention or association of churches which is exempt from tax under section 501 [of
Title 26]." (emphasis added)  In this case, the qualifying entity under Section 414(e) of
the Internal Revenue Code was the Northeastern Conference.  At the point the Pension
Plan was no longer "maintained" or controlled by the Northeastern Conference (or
another party that could not claim Northeastern Conference's status under Section
414(e)), a straight-forward reading of this section of the Internal Revenue Code suggests
that the Pension Plan would cease to be a church plan.  The point at which the Pension
Plan's church status terminated is not clear.  There is no dispute that HMSG would not
qualify under Section 414(e) of the Internal Revenue Code; but it is not clear (and has not

been briefed) whether maintenance of the Pension Plan by the Chapter 11 Trustee would

waive the church plan status. Section 1.2 of the Management Agreement states that

HMSG performed the services under the Managing Agreement as an agent of the

bankruptcy estate; Section 1.5 states that HMSG rendered services under the Managing

Agreement as an independent contractor, subject to the supervision of the "Client,"

defined as "Northeastern Conference Nursing Home, Inc. d/b/a Victory Lake Nursing

Center" and of this Court. As discussed below, the meaning of "maintenance," as used in

Section 414(e) of the Internal Revenue Code is unsettled given the few published cases

discussing the issue.

### A.   Termination of "Church Plan" Status

The Pension Plan Trustee claims that the Pension Plan's "church plan" status was

terminated upon the effective date of the Management Agreement, and that termination

of this status gave rise to funding obligations that were payable by HMSG based upon

HMSG's undertaking in the Management Agreement to pay "all expenses incurred by the

Facility or that become due on or after March 10, 2003."

HMSG rejects the Pension Plan Trustee's argument for several reasons. First,

HMSG cites to the PBGC Statement. The PBGC Statement is potentially persuasive on

this question because it was issued more than ten months after HMSG had assumed

management of Victory Lake. However, the PBGC Statement relied upon two

documents: (1) the Private Letter Ruling and (2) the December 21, 1995 Settlement

Agreement among the PBGC, the Northeastern Conference, Victory Lake and the

Pension Plan. The Pension Plan Trustee argues that the PBGC Statement relied upon

stale information because the critical facts in the Private Letter Ruling had changed after

- 19 -

this Court approved the Management Agreement.

## 1.  **The Private Letter Ruling**

In the Private Letter Ruling the IRS stated that it was relying upon certain "facts and

representations" that had been provided, including the following:

- Victory Lake was owned by the Northeastern Conference, "a religious
  corporation organized pursuant to the Religious Corporations Law" and exempt
  from taxation under Section 501(c)(3) of the Internal Revenue Code.

- Victory Lake "was established" by the Northeastern Conference, and Victory
  Lake was also exempt from taxation under Section 501(c)(3).

- "The business of [Victory Lake] is managed and carried out by its Board of
  Directors, which consists of eleven members, all of whom are members of [the
  Seventh Day Adventist Church] and [the Northeastern Conference].  The
  President and Chairman of the Board of Directors of [Victory Lake] is, and since
  inception always has been, the same individual who serves as President of [the
  Northeastern Conference]; the person filling the position of Secretary of [the
  Northeastern Conference] serves, and always has served, as the Secretary of
  [Victory Lake]; the Treasurer of [Victory Lake] is, and always has been, a pastor
  of [the Northeastern Conference].  These officers are members of [Victory
  Lake's] Board of Directors.  The remaining Directors are also members of [the
  Northeastern Conference] and [the Seventh Day Adventist Church].  The
  Directors all serve as such by virtue of their affiliation to [the Northeastern
  Conference]."

- Victory Lake "is considered an affiliated operation of [the Northeastern
  Conference]" and "is listed in the official directory of [the Northeastern
  Conference]."

- The Pension Plan "was established by Victory Lake" and is "maintained and
  controlled by [Victory Lake's] retirement committee . . . which is comprised of
  the President, Secretary, Treasurer and Administrator of [Victory Lake]," and all
  members of the committee "are appointed . . . by the President of [Victory Lake].

- The sole purpose of [the retirement committee] is to manage the operation and
  administration of [the Pension Plan] in accordance with the [Pension] Plan
  documents.

Based upon the above representations, the IRS confirmed that the Pension Plan was then

a "church plan".  In the course of the Private Letter Ruling, the IRS also stated that:

> In order for an organization to have a qualified church plan, it must
> establish that its employees are employees or deemed employees of the
> church or convention or association of churches under section

414(e)(3)(B) of the code by virtue of the organization's affiliation with the church or convention or association of church and that the plan will be administered by an organization of the type described in section 414(e)(3)(A).

The organization described in Internal Revenue Code Section 414(e)(3)(A) is:

an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.

The Private Letter Ruling held that as of June 15, 1994 the Pension Plan was a church plan; it is not dispositive of whether and when the Pension Plan ceased to be a church plan. It should be noted that, other than the historical information as to the establishment of Victory Lake and the Pension Plan, practically every other fact relied upon by the IRS in the Private Letter Ruling had changed by the time the Management Agreement became effective on March 10, 2003. For example, the business of Victory Lake was no longer managed and carried out by its Board of Directors but by the Chapter 11 Trustee and/or HMSG. The Pension Plan was apparently not being "maintained and controlled" by the retirement committee or administered by an organization described in Internal Revenue Code Section 414(e)(3)(A). After the Management Agreement, Victory Lake's employees were not "employees or deemed employees of the church or convention or association of churches under section 414(e)(3)(B)." At trial, relevant evidence will include the comparison of the facts relied upon by the Private Letter Ruling as they existed at the following points in time: (1) the commencement of the Chapter 11 Case, (2) the appointment of the Chapter 11 Trustee, (3) the effective date of the Management Agreement, (4) approval of the APA, and (5) termination of the Pension Plan. This

evidence will reveal when the Pension Plan ceased to be a church plan and what entity or entities may have been liable to the Pension Plan for underfunding during those periods.

## 2.    The Settlement Agreement

The Pension Plan Trustee also claims that the language cited by HMSG in the Settlement Agreement is inapplicable.  As one of the recitations in the Settlement Agreement, the parties acknowledged their mutual "understanding that the [Pension] Plan, pursuant to ERISA § 4021(b)(3), will not hereafter be covered by the pension insurance program set forth in Title IV of ERISA, and hereby certify that they will not hereafter seek to make an election under the provisions of [Internal Revenue Code] § 410(d) to have the provisions of Title IV of ERISA apply to the Plan as if it were not a church plan." (emphasis added).  The Pension Plan Trustee argues that because the Pension Plan was no longer a church plan once HMSG assumed management, no election under Section 410(d) of the Internal Revenue Code (to declare ERISA provisions applicable to a church plan "as if it were not a church plan") was necessary or even possible.  The Court does not believe that the recitation in the Settlement Agreement can be used to foreclose argument that the Pension Plan was no longer a church plan.

Given the evidence submitted by the parties, summary judgment cannot be awarded to HMSG based upon the PBGC Statement, because the PBGC Statement apparently relied upon outdated documents and information.  Of course, at trial the parties will be permitted to offer competent evidence to show what the PBGC may or may not have been aware of when it opined in the PBGC Statement that the Pension Plan was still a church plan.

**B.**      **Who "Maintained" or Controlled the Pension Plan?**

ERISA and the Internal Revenue Code define a "church plan" according to the entity that maintains the plan. *See* 29 U.S.C. §§ 1002(33)(A), 1321(b)(3); 26 U.S.C. § 414(e). A trial will be necessary to determine who "maintained" or controlled the Pension Plan during the period of the Management Agreement.

As support for its contention that it had no role in the administration of the Pension Plan or, ultimately, the termination of the Pension Plan, HMSG argues that Victory Lake, through the Chapter 11 Trustee, never gave up its governing role in the Pension Plan, and that the Chapter 11 Trustee retained some control and oversight of the Pension Plan even after entering into the Management Agreement with HMSG. HMSG extends this reasoning by arguing that had HMSG been responsible for the Pension Plan, HMSG instead of the Chapter 11 Trustee would have been responsible for seeking termination of the Pension Plan. HMSG asserts that the actions of the Chapter 11 Trustee and Pension Plan Trustee in connection with the Termination Motion "belie the current allegations that the Pension Plan ceased to be a church plan." HMSG's Memo of Law, p. 14. HMSG reasons that termination of a pension plan would be governed by ERISA unless the Pension Plan was not a church plan. "Therefore, if the Pension Plan was not a church plan but rather was a covered Title IV pension plan, the Pension Plan would have to have been terminated in accordance with the termination provisions of Article IV." *Id.* at 14-15.

The Pension Plan Trustee also relies on the circumstances surrounding the Termination Motion to prove the opposite proposition. The Chapter 11 Trustee initially sought termination of the Pension Plan retroactive to March 10, 2003 "which was the

date on which HMSG became the operator of the nursing home for its own account, and, under the terms of its Management Agreement with the Trustee, became the employer of the debtor's employees." Termination Motion, ¶21.  The Chapter 11 Trustee also stated that: "HMSG is unwilling to fund the Pension Plan <u>after</u> it becomes the owner of the debtor's nursing home" (emphasis added).  The Pension Plan Trustee offers the Chapter 11 Trustee's statements in the Termination Motion as evidence that the Chapter 11 Trustee viewed HMSG as the party that was liable for funding the Pension Plan during the period of the Management Agreement.

On December 1, 2003 the Pension Plan's counsel (now the counsel to the Pension Plan Trustee) filed a response to the Termination Motion on the grounds that retroactive termination "could be interpreted to relieve HMSG of a liability which it expressly assumed, to the detriment of participants and without any benefit to the estate." Response of Pension Plan, p. 10.  The Pension Plan's counsel also stated in that motion that it "may have a claim against HMSG for contributions required to have been made from that date forward." *Id.*

The January 8, 2004 Stipulation between the Pension Plan and the Chapter 11 Trustee, which resolved all disputes between those parties regarding the Pension Plan provided that termination of the Pension Plan would be effective as of the effective date of the Chapter 11 Plan.  The effective date of the Chapter 11 Plan was on or about June 25, 2004, which was the last day after the termination of the Management Agreement period and the first date that HMSG became the owner of Victory Lake.

In Paragraph 10 of Stipulation the Chapter 11 Trustee agreed to amend the Chapter 11 Plan to exclude from the broad release provisions any claim that the Pension

Plan may have against the Northeastern Conference. A similar exclusion was not

provided for HMSG. HMSG argues that this fact is probative of the intent to release

HMSG from any Pension Plan liability. However, Paragraph 7 of the Stipulation states:

> Neither Termination nor anything in this Stipulation or in any Order
> approving this Stipulation shall directly or indirectly preclude or be
> deemed to preclude the Pension Plan from asserting and prosecuting at no
> cost to the debtor, the Estate or the Trustee, any and all claims it may have
> against persons and entities other than the debtor, the Estate the Creditors'
> Committee and the Trustee and their respective attorneys and other court-
> approved professionals.

HMSG did not file a response to the Termination Motion or to the January 8, 2004

Stipulation.[7]

In addition to the other evidence presented on the issues set forth in Part III A.

and C of this decision, on the question of who "maintained" or controlled the Pension

Plan during the period of the Management Agreement, the Court will consider the

Termination Motion and the Stipulation, along with other competent evidence of the

circumstances surrounding the termination of the Pension Plan, such as (1) the

negotiations that lead to the January 8, 2004 Stipulation and the Chapter 11 Trustee's

withdrawal of the request for retroactive termination, and (2) communications, if any,

with HMSG. It is also anticipated that the considerations in *Hightower v. Texas Hosp.*

*Ass'n*, 65 F.3d 443 (5th Cir. 1995) and the factors set forth in *Lown v. Cont'l Cas. Co.*,

238 F.3d 543 (4th Cir. 2001) (each discussed at Part III.C.1., *infra*) will guide the Court's

decision of the issue of maintenance and control.

---

[7]        HMSG initially claimed that its counsel was not served with the Termination Motion. HMSG
now retracts this claim but argues that "frankly whether or not HMSG was served with the papers in the
termination proceedings is immaterial to the adjudication of this case." HMSG's Reply Memorandum, p.
12, n. 7.

C. **Liability for Pension Plan Expenses**

1. **Assumption of Pension Plan**

HMSG argues that it was not an Employer, Plan Sponsor or Participating

Employer as those terms are defined in the Pension Plan.  HMSG cites to the following

provisions in the Pension Plan:

- The only persons entitled to participate in the Pension Plan were eligible "Employees." Pension Plan § 2.01.

- "Employee" is defined under the Pension Plan as "any person who is employed by the Employer or a Participating Employer." Pension Plan § 1.17(a).

- The Pension Plan specifically provides for contributions to be made by the "Employer" and "any Participating Employers." Pension Plan § 8.08.

- "Employer" and "Plan Sponsor" are defined as Victory Lake. Pension Plan § 1.18.

- A "Participating Employer" is defined as "any organization which has adopted this Plan and Trust in accordance" with the Pension Plan's procedures. Pension Plan § 1.18.

- An organization adopts the Pension Plan and qualifies as a Participating Employer only by written resolution and with the consent of the Plan Sponsor, Victory Lake. Pension Plan § 8.07.

HMSG argues that it could not be construed to be an Employer, Plan Sponsor or

Participating Employer as those terms are defined in the Pension Plan.  HMSG argues

that the Pension Plan defines the "Employer" as Victory Lake Nursing Home, so that

HMSG cannot be the Employer responsible for making contributions.  Likewise, HMSG

claims that when the employees became employees of HMSG, they were no longer

"Employees" of Victory Lake.  Moreover, HMSG argues it didn't become a

"Participating Employer" under the Pension Plan because it did not adopt the Pension

Plan in accordance with the procedures set forth in Section 8.07 of the Pension Plan,

which require a written resolution and the consent of the Plan Sponsor.

The Pension Plan Trustee answers that HMSG nevertheless assumed

responsibility for funding the Pension Plan pursuant to section 1.4 of the Management

Agreement, captioned "Profits and/or Losses" which required that HMSG:

> [S]hall be responsible for <u>all expenses incurred by the Facility or that</u>
> <u>become due on or after March 10, 2003</u>, on an accrual basis in accordance
> with Generally Accepted Accounting Principles during its period of
> operation of the Facility under this Agreement and shall retain all income
> received by the Facility during Manager's period of operation of the
> Facility under this Agreement. Without limiting the generality of the
> foregoing the Manager shall make the adequate protection payments that
> become due and payable to the New York State Housing Finance Agency
> on and after the date hereof during the term of this Agreement.  Manager
> shall pay all accounts payable and expenses of the Facility when due and
> payable.

(emphasis added).  The Pension Plan Trustee also offers the following arguments:

- Section 2.3 of the Management Agreement authorized HMSG to
  "contract on behalf of the Facility, in the name of the Facility. . ."

- Section 2.5 of the Management Agreement authorized HMSG "to hire
  on behalf of the Facility, in the name of the Facility" and provides, in
  part, "All operational employees shall become and remain employees
  of [HMSG] so long as this Agreement is in effect or until such time as
  [HMSG] purchases the Facility. . ."

- Section 4.4 of the Management Agreement requires HMSG to
  "comply with all federal, state and local laws, rules and regulations
  and requirements which are applicable to the Facility . . ."

- According to paragraph 21 of the Termination Motion, HMSG
  operated the Nursing Home "for its own account".

- HMSG continued the operations of the Nursing Home in the same
  location, and under the same name.

Pension Plan Trustee's "Statement of Disputed and Undisputed Material Facts," ¶4.

Thus, the Pension Plan Trustee argues that Victory Lake Nursing Home is not defined in

the Pension Plan, and MSG became Victory Lake Nursing Home for all purposes, and

therefore the "Employer" as defined in the Pension Plan:

> HMSG was not merely hired to manage the Nursing Home for a fee.
> It became the operator of the Nursing Home, entitled to the profits and

> responsible for the losses, and thereby enjoyed all the rights and
> suffered the responsibilities of that status.

Pension Plan Trustee's Memo of Law, p. 27.  Thus, the Pension Plan Trustee argues that

there was "substantial continuity" in the nature, operation and identity of the business

before and after March 10, 2003 so that "in the eyes of the law, HMSG, *d/b/a Victory*

*Lake Nursing Home,* was responsible for the Nursing Home's obligations whether or not

it signed a particular agreement to become responsible." *Id.* at 28.

        HMSG argues that cases supporting the Pension Plan Trustee's "substantial

continuity" argument are inapposite and that liability has only been imposed on a

subsequent employer in the context of (1) a sale and purchase, or transfer, of assets (as

opposed to a management contract), or (2) a mere technical change in the identity of a

single corporation.  It is true that those cases decided the "substantial continuity" question

in different, fact-specific scenarios.  This Court does not read the cases cited by the

Pension Plan Trustee as inconsistent with the legal proposition for which they are offered.

It is the opinion of this Court that restricting substantial continuity to the circumstances

listed by HMSG would result in the elevation of form over substance.  In fact, in one of

the cases cited by the Pension Plan Trustee, the Second Circuit noted in passing that: "It

has since been decided, furthermore, that '[s]o long as there are other indicia of

"substantial continuity," the way in which a successor obtains the predecessor's assets is

generally not determinative of the "substantial continuity" question'." *Stotter Div. of*

*Graduate Plastics Co., Inc. v. Dist. 65, United Auto Workers, AFL-CIO*, 991 F.2d 997,

1001, n. 1 (2d Cir. 1993) (quoting *Fall River Dyeing & Finishing Corp. v. NLRB*, 482

U.S. 27, 44 n. 10, 107 S.Ct. 2225, 2237 n. 10, 96 L.Ed.2d 22 (1987)).

Another case cited by the Pension Plan Trustee sets forth the factors that courts have used to determine "whether there is 'substantial continuity' between the enterprises":

These factors include whether there has been a substantial continuity of the same business operation; whether the new employer uses the same plant; whether the same or substantially the same work force is employed; whether the same jobs exist under the same working conditions; whether the same supervisors are employed; whether the same machinery, equipment, and methods of production are used; and whether the same product or service is offered. . . . It is not necessary for all of these factors to be present if, under the totality of the circumstances, there is substantial continuity between the old and new enterprise. . . .

Other courts use a similar analysis, but speak in terms of the second employer being the "alter ego" of the signatory. . . . **Whatever the standard, the factual question is whether the difference between the two entities is based on technical structure rather than an actual, substantive change in ownership or management**.

*Or. Laborers-Employers Health & Welfare Trust Fund v. All State Indus. and Marine Cleaning, Inc.*, 850 F.Supp. 905, 909 (D. Or., 1994) (emphasis added) (citations omitted). The factors relied upon in this case could be applied to find substantial continuity even where there was no "actual, substantive change in ownership or management," and those factors potentially could be applied where the new "employer" is a Chapter 11 Trustee or a corporation that operates under a management agreement, employing the same work force, with the intention to purchase the assets at a later time. *Id.* The case also confirms that substantial continuity cases must be decided "under the totality of the circumstances" and is necessarily a fact-intensive inquiry. *Id.*

A material issue of fact exists as to whether there was substantial continuity such that HMSG became Victory Lake and therefore potentially liable under the Pension Plan as the "Employer". As discussed above, in addition to evidence of "substantial continuity" in HMSG's operation of Victory Lake under the Management Agreement, the

Court will consider evidence as to whether the Chapter 11 Trustee or some entity other

than HMSG continued to control, monitor or maintain the Pension Plan up to the point

when the Pension Plan was terminated.

  HMSG also argues that "[t]o become a 'Plan Sponsor' under the Pension Plan,

HMSG would have to have taken express, affirmative and intentional steps to assume the

Pension Plan, which it never did." HMSG's Memo of Law, p. 8.  For this proposition,

HMSG cites *Hightower v. Texas Hosp. Ass'n*, 65 F.3d 443 (5th Cir. 1995), a case that is

not particularly helpful to HMSG.  In *Hightower*, the Fifth Circuit affirmed the district

court's finding that an entity that leased a government-established hospital assumed

responsibility for surplus funds created by the lessor's termination of the hospital

employees' retirement plan.  Similar to the "church plan" exemption at issue in this case,

the retirement plan in *Hightower* was established by a government entity and exempt

from the provisions of ERISA as a "governmental plan". *Id.* at 447.  However, as HMSG

asserts, *Hightower* is distinguishable from this case because the lessor expressly assumed

responsibility for the pension plan. *Id.* at 448-49.  Once the lessor assumed responsibility

for the pension plan, the plan was no longer the responsibility of a governmental entity,

and became subject to the provisions of ERISA.  The Fifth Circuit based its ruling on the

lessor's assumption of the pension plan, notwithstanding the lessor's "limited

involvement" with the pension plan after assuming it and lessor's argument that it did not

"maintain" the plan. *Id.* at 449.  The Fifth Circuit explained its reasoning:

> It is this court's opinion that the result reached herein comports with the
> general goals of the statute and further protects the employees of the
> pension plan.  To hold otherwise could well frustrate the goals, intent and
> purposes of ERISA.  The statute was designed to prevent the known past
> abuses and possible future mismanagement of employee retirement plans.
> Government plans received an exemption from ERISA because of their

> ability to tax and thereby avoid the pitfalls of underfunding. . . . Once the
> [lessor] executed the lease, the [government entity] no longer had
> responsibility to maintain the Plan or the ability to tax to avoid possible
> Plan underfunding.
>
> This court finds that <u>under the facts before us, once the [lessor] assumed
> control of a previously exempt pension plan and the employees of that
> Plan through the Lease Agreement, that Plan lost its exempt status and
> became a covered plan</u> subject to the provisions of Title IV of ERISA.

*Id.* at 449-50 (emphasis added) (citations to legislative history omitted).

The Pension Plan Trustee cites *Lown v. Cont'l Cas. Co.*, 238 F.3d 543 (4th Cir.

2001).  Lown, a claimant under a retirement plan, challenged the Fourth Circuit's federal

question jurisdiction by contending that the plan in question was a church plan, rather

than an ERISA plan.  The Fourth Circuit resolved the issue using the following standards:

> [ERISA] defines church plans to include plans "maintained by an
> organization, whether a civil law corporation or otherwise, … if such
> organization is controlled by or associated with a church or a convention
> or association of churches." [29 U.S.C. § 1002(33)(C)(i)]. An organization
> is controlled by a church when, for example, a religious institution
> appoints a majority of the organization's officers or directors. 26 C.F.R. §
> 1.414(e)-1(d)(2) (2000).  To be "associated with a church," the
> corporation must share "common religious bonds and convictions with
> that church or convention or association of churches." 29 U.S.C. §
> 1002(33)(C)(iv).

*Id.* at 547.  The pension plan in *Lown* was established and originally maintained by a

hospital affiliated with the South Carolina Baptist Convention, but the hospital's board

voted to remove itself as an agency of the Convention.  The Fourth Circuit found that the

hospital was not controlled by the Convention because the Convention did not appoint or

approve a majority of the hospital's board or officers, and Lown could not point to any

other factors indicating that the Convention controlled the hospital. *Id.* at 548.  Next, the

Fourth Circuit considered whether the hospital remained associated with the Convention

due to sufficiently "common religious bonds and convictions." *Id.*

> In deciding whether an organization shares such common bonds and
> convictions with a church, three factors bear primary consideration: 1)
> whether the religious institution plays any official role in the governance
> of the organization; 2) whether the organization receives assistance from
> the religious institution; and 3) whether a denominational requirement
> exists for any employee or patient/customer of the organization.

Because the hospital no longer met any of the three criteria, the hospital's retirement plan

was no longer a "church plan," but had become an ERISA plan.

While not conclusive on the facts of this case, *Hightower* and *Lown* do seem to

agree that once the entity that originally qualified the pension plan for "church plan"

status relinquishes control of the pension plan or is no longer associated with the

operating entity, the pension plan's exempt status is lost.

## 2. <u>Management Agreement Negotiations</u>

A good deal of time was spent at oral argument, and in the parties' memoranda,

discussing whether HMSG's agreement in Section 1.4 of the Management Agreement to

"be responsible for all expenses incurred by the Facility" is ambiguous. This is an

important threshold issue when suing under the Management Agreement, because the

Management Agreement contains a merger clause that precludes the introduction of

parole evidence unless a provision is ambiguous. HMSG argued:

> [B]ecause the Pension Plan was a church plan for which no minimum
> contributions were required it is clear that the Pension Plan could not have
> been thought to be an "expense of the Facility" for which HMSG was to
> become responsible under the Management Agreement. But if it were
> nonetheless possible to construe the term "expense" as used in the
> Management Agreement to include the Pension Plan – and we submit it is
> not reasonably possible – extrinsic or parole evidence is clearly admissible
> to help resolve this ambiguity notwithstanding the merger clause.

HMSG's Reply Memorandum of Law, p. 9. The Pension Plan Trustee also took the

position that the phrase is perfectly clear: "all expenses incurred by the Facility" include

any expenses relating to pension plan funding requirements. Notwithstanding each

party's argument that the meaning of the phrase "expenses of the Facility" is clear and

cannot possibly have the meaning contended by the other party, both HMSG and the

Pension Plan Trustee each site to conflicting extrinsic evidence.  HMSG maintains in its

statement of undisputed facts that it was "assured by the Chapter 11 Trustee that it would

have no responsibility or other obligation with respect to the Pension Plan under the

terms of the Management Agreement, the Pension Plan, or otherwise."  The Pension Plan

Trustee's statement of undisputed facts alleges: "James Woods, who was understood to

be one of the owners of HMSG, told Jamie Evans, a former employee of the Nursing

Home, that 'HMSG was going to have to put a lot of money into the Retirement Plan as

part of the deal to purchase the Nursing Home'." HMSG argues:

> [E]vidence of the Chapter 11 Trustee's assurances to HMSG during the
> negotiation of the Management Agreement is admissible to resolve the
> alleged ambiguity, and such evidence indisputably establishes that the
> parties to the Management Agreement did not intend to HMSG to have
> any responsibility or obligation with respect to the Pension Plan under the
> "expenses incurred by the Facility' provision of the Management
> Agreement or otherwise".

*Id.* at 10.

Because the Pension Plan Trustee now sues under the Pension Plan rather than the

Management Agreement, competent evidence concerning negotiations of the

Management Agreement will be admissible to show whether HMSG intended to step into

the shoes of the Chapter 11 Trustee for all purposes, as the Pension Plan Trustee

contends.  Evidence of HMSG's intent and conduct will be relevant to show whether or

not HMSG operated Victory Lake with such continuity and identity that it became

Victory Lake "in the eyes of the law," regardless of whether HMSG signed a particular

agreement to become responsible.  Other issues concerning the experience and

sophistication of HMSG, may be relevant to determine whether HMSG knew or should

have anticipated potential liability under the Pension Plan.  Finally, the current status of

the nursing home employees and HMSG's ERISA obligations after the APA may be

relevant to an understanding of when, if ever, HMSG had minimum funding obligations

under ERISA for the employees who were formerly covered by the Pension Plan.

### 3.  Release of HMSG in Chapter 11 Plan

Although HMSG concludes that the Chapter 11 Plan and Confirmation Order

expressly released HMSG from any claims of the Pension Plan, the Pension Plan Trustee

disagrees.  The Pension Plan Trustee argues that HMSG was released only to the extent

provided in Sections 9.1 through 9.4 of the Chapter 11 Plan.  Specifically, the Pension

Plan Trustee argues that the claims of the Pension Plan were not released because those

claims do not arise "out of the business or affairs of the Debtor."

The Pension Plan Trustee argues:

> The claims of the Plan Trustee do not "aris[e] out of the business or affairs
> of the *Debtor,*" but are based on the effect of the Management Agreement
> on the Retirement Plan—namely, the cessation of "church plan" status
> resulting from *HMSG* becoming the employer of the Nursing Home
> employees and assuming responsibility for "all expenses" of the Facility.
> HMSG's obligations and liabilities arise under the Management
> Agreement, the Retirement Plan and by federal law, and sections 9.1 and
> 9.2 of the Chapter 11 Plan expressly *exclude* "obligations or liabilities
> under this Plan, the Asset Purchase Agreement or the Management
> Agreement" from the scope of the waiver and release.

Pension Plan Trustee's Memorandum of Law, p. 24 (emphasis in original).

At first glance, HMSG's release in the Chapter 11 Plan from liability "in any way

relating to the business or affairs of the Debtor" would appear to preclude any liability on

HMSG's part for failure to fund the Pension Plan.  The Pension Plan Trustee took the

position that HMSG managed Victory Lake "for its own account" so that any expenses

incurred by Victory Lake were expenses that related to the business and affairs of

HMSG, rather than the Debtor.  At oral argument counsel for the Pension Plan Trustee

offered a hypothetical example of fuel oil purchased by HMSG after the effective date of

the Management Agreement.  The Pension Plan Trustee argued that HMSG's failure to

pay for the fuel oil would be a liability relating to the business and affairs of HMSG and

not released by the Chapter 11 Plan.  The facts at trial may show that during the period

HMSG operated under the Management Agreement its practice was to treat such

expenses as its own affairs rather than the "business or affairs of the Debtor," and this

would undermine HMSG's reliance on the releases in the Chapter 11 Plan to absolve it

from any liability in connection with the Pension Plan.  In the same vein, evidence of

deference by HMSG to the Chapter 11 Trustee on all Pension Plan issues would suggest

that the Pension Plan always related to the business or affairs of the Debtor for which

HMSG has been released from any liability.


## IV.    <u>Equitable Relief</u>

Finally, the Pension Plan Trustee argues that because "there is no other remedy

that will redress HMSG's breach of fundamental statutory duties" the Pension Plan

should be entitled to equitable relief under 29 U.S.C. §§ 1132(a)(3) and 1370. [8] *See*

Pension Plan Trustee's Memorandum of Law, p. 30-38.

---

[8]      29 U.S.C. § 1132(a)(3) allows a civil action to be brought:

by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates
any provision of this subchapter or the terms of the plan, or (B) to obtain other
appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions
of this subchapter or the terms of the plan[.]

29 U.S.C. § 1370 provides in relevant part:

**Enforcement authority relating to terminations of single-employer plans**

(a) In general

At pages 5-7 of its Reply Memorandum, HMSG briefly responded, arguing that the Pension Plan Trustee cannot "magically" turn a $475,000 claim into a claim for equitable relief and characterizes the Plaintiff's request as one to treat the claim for money damages "as one for equitable relief simply because he has nowhere else to turn."

The Pension Plan Trustee states:

---

> Any person who is with respect to a single-employer plan a fiduciary, contributing sponsor, member of a contributing sponsor's controlled group, participant, or beneficiary, and is adversely affected by an act or practice of any party (other than the corporation) in violation of any provision of section 1341, 1342, 1362, 1363, 1364, or 1369 of this title, or who is an employee organization representing such a participant or beneficiary so adversely affected for purposes of collective bargaining with respect to such plan, may bring an action--
>
> > (1) to enjoin such act or practice, or
> >
> > **(2) to obtain other appropriate equitable relief (A) to redress such violation or (B) to enforce such provision.**
>
> * * *
>
> (c) Jurisdiction and venue
>
> The district courts of the United States shall have exclusive jurisdiction of civil actions under this section. Such actions may be brought in the district where the plan is administered, where the violation took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found. The district courts of the United States shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to grant the relief provided for in subsection (a) of this section in any action.
>
> (d) Right of [PBGC] to intervene
>
> A copy of the complaint or notice of appeal in any action under this section shall be served upon the [PBGC] by certified mail. The corporation shall have the right in its discretion to intervene in any action.
>
> (e) Awards of costs and expenses
>
> > (1) General rule
> >
> > In any action brought under this section, the court in its discretion may award all or a portion of the costs and expenses incurred in connection with such action, including reasonable attorney's fees, to any party who prevails or substantially prevails in such action.
> >
> > (2) Exemption for plans
> >
> > Notwithstanding the preceding provisions of this subsection, no plan shall be required in any action to pay any costs and expenses (including attorney's fees).
> >
> > * * *
>
> (emphasis added)

- 36 -

> In bankruptcy, all responsible parties, the Debtor the Chapter 11 Trustee, the PBGC and now HMSG, turned their backs on the Retirement Plan, claiming – despite the Nursing Home's obvious non-affiliation with any church after March 2003 – that it is still a "church plan" entitled to no protection at all. The only person who seeks the Court's protection – the Plan Trustee – is claimed to have no standing; the only entity claimed to be authorized by law to provide protection – the PBGC – has already taken the position that the Retirement Plan is outside its jurisdiction. If ever a case cried out for equity, this is that case.
>
> In this case, any relief must come from equity. In the unique circumstances presented here – from ERISA plan to church plan, followed by the complete cessation of funding and the consequent massive underfunding of vested benefits, then bankruptcy, a new, non-church operator and restoration of ERISA status – relief will be relief that equity has traditionally provided: a remedy where there is no other.

Pension Plan Trustee's Memo of Law, p. 38.

The Court declines to rule on the equity arguments as they are premature. Accordingly, the Court does not deal at this time with other possible problems with asserting a claim under 29 U.S.C. § 1370, such as the apparent conferment of exclusive jurisdiction upon the district courts of the United States in 29 U.S.C. § 1370(c) or the requirement under 29 U.S.C. § 1370(d) that the PBGC be served with notice of any action under this section (the Complaint does not demand relief under 29 U.S.C. § 1370).

A trial on the issues set forth above will determine whether the Pension Plan Trustee has a legal remedy. However, HMSG's objections are well taken. Although the Pension Plan is a most sympathetic plaintiff, this Court will not craft an equitable remedy for the Pension Plan, at the expense of HMSG, solely because there is no other means of compensation available to the Pension Plan.

## Conclusion

Upon the foregoing, both motions for summary judgment are denied. The parties shall proceed to trial on the limited issues set forth in this memorandum decision. Counsel for the Pension Plan Trustee and HMSG are requested to submit an amended

scheduling order setting forth new discovery deadlines and a deadline for the submission

of a joint pre-trial order.   A further pre-trial conference will be held in this case on April

25, 2006 at 11:30 a.m.


Dated:  Poughkeepsie, New York
        March 2, 2006

                                    ___/s/ Cecelia Morris_____
                                          U.S.B.J.